1
2
3
4          **UNITED STATES DISTRICT COURT**
5             **DISTRICT OF NEVADA**
6                    * * *
7  THEODORE LEACH, *et. al.*,              Case No. 2:22-cv-01809-RFB-NJK
8          Plaintiffs,                          **ORDER**
9       v.
10 DENNETT INGRAM, *et al.*,
11         Defendants.
12

13        Before the Court are Defendants' Motion for Summary Judgment (ECF No. 110),

14 Plaintiffs' Motion to Appoint Receiver (ECF No. 123), and Defendants' Motion to Strike (ECF

15 No. 130). For the following reasons, Defendants' Motion for Summary Judgment and Motion to

16 Strike are partially granted. Meanwhile, Plaintiffs' Motion to Appoint Receiver is denied.

17

18 **I.    PROCEDURAL HISTORY**

19        On October 6, 2022, Plaintiffs[1] filed a complaint in the Eighth Judicial District Court of

20 the State of Nevada. See ECF No. 1-1. On October 28, 2022, Defendants removed this case to

21 federal court. See ECF No. 1. The case was originally assigned to the Honorable Judge Jennifer

22 A. Dorsey of the U.S. District Court for the District of Nevada.

23        On July 14, 2023, the Court approved a stipulation limiting Defendants ability to "sell,

24 transfer, or convey" disputed assets. See ECF No. 33.

25        With the Court's permission, Plaintiffs filed the Second Amended Complaint on September

26 17, 2024. See ECF Nos. 103, 104. Through this filing, Plaintiffs added Haxxr Pte Ltd. ("Haxxr")

27

28        [1] On August 7, 2022, the Court appointed Jason Kerrigan as guardian *ad litem* for his father James Kerrigan for the purposes of this case. See ECF No. 92. Thus, the Court's references to "Plaintiffs" throughout this Order cover Jason Kerrigan.

as a defendant in this case. See id. Defendants filed their amended answer on October 2, 2024. See ECF No. 106.

On November 4, 2024, Defendants filed a motion for summary judgment on Plaintiffs' claims. See ECF No. 110. Pursuant to an extended briefing schedule, see ECF No. 114, Plaintiffs responded on December 5, 2024. See ECF No. 120. Defendants filed their reply on December 19, 2024. See ECF No. 126.

On December 12, 2024, Plaintiffs filed a motion to appoint receiver. See ECF No. 123. Defendants responded on December 26, 2024. See ECF No. 127. Plaintiffs filed their reply on January 2, 2025. See ECF No. 129. On January 8, 2025, Defendant filed a motion to strike portions of this reply. See ECF No. 130. Plaintiffs responded to Defendant's motion to strike on January 22, 2025. See ECF No. 131.

On June 20, 2025, Judge Dorsey recused herself from further participation in this case. See ECF No. 132. The case was randomly reassigned to the Honorable Judge Richard F. Boulware, II of the U.S. District Court of Nevada on June 23, 2025. See ECF No. 133.

## II.    FACTUAL BACKGROUND

At its core, this case is a commercial dispute about a block of approximately 65,000 internet addresses ("IP Assets"). The Court's factual findings are as follows.

### A.  Undisputed Facts

Based on its review of the record, the Court finds the following facts to be undisputed.

Defendant Dennett Ingram is the principal-decision maker for the four corporate Defendants involved in this case: EpicUp Holdings, Inc. (Arizona); EpicUp Holdings, Inc. (Wyoming); EpicUp PTE. Ltd ("EpicUp PTE"); and Haxxr Pte Ltd. ("Haxxr"). EpicUp PTE and Haxxr are Singaporean entities. Meanwhile, Plaintiffs Theodore Leach and James Kerrigan are individual investors who partnered with Defendants to sell the IP Assets.

In November 2021, Plaintiffs agreed to loan Ingram $200,000 so that he could acquire full legal title to the IP Assets such that he could sell them. Legal title to internet addresses is determined by a series of worldwide registry organizations. Each organization exercises regional

jurisdiction over a specific range of internet addresses, and addresses cannot be transferred without their respective organization's approval. The American Registry for Internet Numbers, Ltd. ("ARIN") exercises jurisdiction over the IP Assets.

On November 23, 2021, the Parties entered into a written brokerage agreement ("Brokerage Agreement"). It is undisputed that the Brokerage Agreement was drafted by Plaintiffs. Under its terms, Plaintiffs could earn a percentage of the final sale price of the IP Assets by brokering their sale. For the purposes of this Order, the Brokerage Agreement features the following key provisions:

- "The general intent of the parties is to ensure that [Defendant EpicUp Holdings, Inc. (Arizona)] takes ownership and complete interest in the IP numbers." ECF No. 121-3 at ¶ 3.

- "[C]ommissions . . . would be paid to the BROKERS after the listed IP numbers are sold." Id. ¶ 4.

- "By signing below, the SELLER agrees that once the identity of the purchaser is revealed, that certain enumerated compensation be paid to the BROKER for the consideration of obtaining the particular purchaser." Id. ¶ 7.

- "As compensation for the sale the SELLER will receive the greater of 2.2 million US dollars or 80% of the final sale price paid by the buyer." Id. ¶ 8

- "[T]he BROKERS agree[ ] to take all appropriate measures and action in order to facilitate the sale of the IP addresses." Id. ¶ 13.

- "This Agreement constitutes the entire agreement between the parties with respect to this transaction. This Agreement may not be changed or modified except by instrument in writing signed by the parties hereto." ECF No. 121-3 at ¶ 15.

- "This Agreement shall automatically expire as of 5:00 P.M. . . . March 1st, 2022, unless prior to such date and time it has been fully executed by the parties and delivered with all contemplated attachments by Seller to Buyer." Id. ¶ 17.

Shortly thereafter, Plaintiffs identified a prospective buyer for the IP Assets: Jack Hazan, the Executive Vice President of Northeast Technologies II, LLC ("Northeast Technologies"). On

1    December 21, 2021, Plaintiffs transferred $200,000 to Defendants. Acting on behalf of Defendant

2    EpicUp PTE, Ingram entered into a purchase agreement with Mr. Hazan for the sale of the IP

3    Assets ("Purchase Agreement"). The Purchase Agreement was drafted by Northeast Technologies,

4    and it explicitly identifies EpicUp PTE and Northeast Technologies as "Parties." ECF No. 121-8

5    at 1. Furthermore, it sets the purchase price at $2,925,000. See id. ¶ 2. The Purchase Agreement

6    also clarifies that "[a]ll prior . . . agreements . . . between the Parties . . . are superseded by [it]."

7    Id. ¶ 17. Finally, it establishes a 60-day closing period from the time of signing. See id. ¶ 4. The

8    Parties did not clear title to the IP Assets during this period.

9         In late February 2022, Ingram sent Plaintiffs a series of communications discussing the

10   potential extension of the Brokerage Agreement. Relevant here, Ingram proposed "continu[ing]

11   everything as is, maybe set[ting] a new loan ending period for 1 year from [then]. [Plaintiffs would]

12   for sure [ ] get [their] investment back eventually, along with 20% of the sale." ECF No. 121-12

13   (February 21, 2022, email from Ingram to Plaintiffs). Ingram also proposed expanding the Parties'

14   agreement "to include leasing." Id. A few days later, Ingram sent a text message stating that he

15   gave Plaintiffs "50% of leasing revenue for perpetuity / until [they sell the IP Assets], whenever

16   that is." ECF No. 121-14.

17        On March 5, 2022, Plaintiff Ted Leach sent an email stating that "[t]he 50/50 split on the

18   lease is ok with [him] and [he] think[s] leaving the original agreement in place . . . makes the most

19   sense." ECF No. 121-17 (March 5, 2022, email exchange between Ingram and Plaintiffs). That

20   same day, Ingram reaffirmed that "[t]he 50/50 split on the lease is okay with [him], and [that he is

21   also] willing to leave the original agreement in place." Id.

22        On March 14, 2022, Defendant EpicUp PTE entered a month-to-month lease with Oculus

23   Networks ("Oculus Lease") which was arranged by Hazan on behalf of Hilco IP Services LLC

24   ("Hilco"). The Parties signed a Memorandum of Agreement ("MOA") in which they agreed to

25   split lease proceeds in half. See ECF No. 121-18 at ¶ 4. It is undisputed that lease revenue proceeds

26   were disbursed in accordance with the MOA until the lease expired in August 2022. Plaintiffs have

27   not received any lease revenue since then.

28        On July 13, 2022, Ingram emailed Hazan to inquire whether he would "be willing to draft

- 4 -

up a new agreement . . . [that is] the exact same as before, just with a new expiration date, and it won't involve Ted or Jason at all." ECF No. 121-21. Then, on September 3, 2022, Ingram sent a follow up email asking Hazan to confirm that their new agreement is "not related or connected to [Plaintiffs] in any way." ECF No. 121-28.

On August 24, 2022, ARIN notified Ingram that title had been cleared and placed in EpicUp's name. At the same time, ARIN placed a one-year restriction on EpicUp's ability to transfer title to anyone.

**B. Disputed Facts**

The Court finds that the following facts are disputed by the Parties.

First, the Parties dispute whether Defendants fully disclosed the IP Assets' title issues before Plaintiffs disbursed the $200,000 loan. According to Plaintiffs, Ingram misrepresented that "there would be no title issues and that the IPs could be sold immediately." ECF No. 121-29 at ¶ 17 (declaration of Jason Kerrigan). Meanwhile, Defendants allege that they fully disclosed the presence of title issues through a series of email exchanges in late November 2021.

Second, the Parties dispute whether the Brokerage Agreement was extended beyond March 2022. Defendant alleges that the Parties never executed a signed agreement modifying this deadline. In response, Plaintiffs point to various communications in which the Parties discuss an extension.

Third, the Parties dispute whether Hazan was still a prospective buyer after the expiration of the Purchase Agreement. Defendants point to the Purchase Agreement, which lapsed when the Parties failed to clear title to the IP Assets during the agreement's closing period. Plaintiffs cite Mr. Hazan's deposition testimony, in which he confirmed that his company was "ready, willing, and able as of August 29th, 2022, to close the deal." ECF No. 121-31 at 97.

Fourth, the Parties dispute whether Plaintiffs fulfilled their obligation to "facilitate the sale" of the IP Assets under the Brokerage Agreement. Defendants allege that Plaintiffs made no meaningful efforts to clear title. Meanwhile, Plaintiffs point Ingram's December 8, 2021, email, in which he states that he does not "think there is much needed on [Plaintiffs'] side . . . until [he finishes] getting these transitions all approved and finalized." ECF No. 121-4.

Fifth, the Parties dispute whether they entered a contract that entitles Plaintiffs to more lease proceeds. Defendants assert that Plaintiffs have received everything they are owed pursuant to the terms of the MOA. Meanwhile, Plaintiffs point to a series of communications to show that the Parties entered a broader contract entitling Plaintiffs to lease revenue until the sale of the IP Assets.

Sixth, the Parties dispute which Defendant owns and controls the IP Assets. Defendants claim that title remains in EpicUp Holdings. In response, Plaintiffs point to various documents that describe EpicUp PTE as the owner of the IP Assets.

## III.    LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing a matter determines which facts are material to a case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Since all of Plaintiffs' claims arise under state law, the Court looks to Nevada law throughout the course of this Order. See In re Cnty. of Orange, 784 F.3d 520, 527 (9th Cir. 2015) ("[F]ederal courts sitting in diversity apply state substantive law.") (citation omitted).

The moving party bears the burden of showing the absence of material disputes of fact. See Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to show specific facts demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the Court views all facts and draws all inferences in the light most favorable to the nonmoving party. See Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

Nevertheless, the nonmoving party may not merely rest on the allegations of their pleadings. They must produce specific facts by affidavit or other evidence showing a genuine issue

of fact. <u>See</u> <u>Anderson</u>, 477 U.S. at 256. In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. <u>See</u> <u>Zetwick v. Cnty. of Yolo</u>, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

The parties must support their motion and opposition with evidence, and specific references to the record, that they want the Court to consider. <u>See</u> FED. R. CIV. P. 56(c)(A); <u>Carmen v. S.F. Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). It is not the Court's task "to scour the record in search of a genuine issue of triable fact;" rather, the Court relies on the parties to "identify [evidence] with reasonable particularity . . . ." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996); <u>Schneider v. TRW, Inc.</u>, 938 F.2d 986, 990 n.2 (9th Cir. 1991) (A "[d]istrict court is under no obligation to mine the full record for issues of triable fact").

**B. Appointing a Receiver**

Pursuant to its equitable powers, this Court has broad discretion to appoint a receiver. <u>See</u> <u>Can. Life Assurance Co. v. LaPeter</u>, 563 F.3d 837, 845 (9th Cir. 2009); <u>see also</u> FED. R. CIV. P. 66. "[A]ppointing a receiver is an extraordinary equitable remedy, which should be applied with caution." <u>Id.</u> at 844 (citations and internal quotation marks omitted). The Ninth Circuit has approved of seven non-exclusive factors that district courts should consider when asked to appoint a receiver. <u>See</u> <u>infra</u> Part IV.B.ii.

**IV.    DISCUSSION**

**A. Motion for Summary Judgment**

Defendants bring a motion for summary judgment against all 16 of Plaintiffs' claims. In turn, the Court addresses each claim below.

**i.  *Plaintiffs' Breach of Contract Claim (Count 1).***

In Nevada, a breach of contract claim requires "(1) the existence of a valid contract, (2) a

breach by the defendant, and (3) damages as a result of the breach." <u>Saini v. Int'l Game Tech.</u>, 434 F.Supp.2d 913, 919–20 (D. Nev. 2006) (<u>citing</u> <u>Richardson v. Jones</u>, 1 Nev. 405, 408 (1865)). Defendants focus on the first element. According to Defendants, Plaintiffs' breach of contract claim fails because the Parties' rights and obligations were limited to the Brokerage Agreement and the MOU. To simplify their argument, these agreements expired; therefore, Defendants' conduct did not, and cannot, breach them. Based on the Parties' communications, the Court cannot agree with Defendants as a matter of law.

### 1.   Extension of Terms of Brokerage Agreement.

Although the Brokerage Agreement does not entitle Plaintiffs to compensation for merely identifying a prospective seller, there is a genuine dispute of material fact regarding the extension of its terms.

As a preliminary matter, the Court rejects Plaintiffs' interpretation of the Brokerage Agreement, under which they earned a commission when they identified a prospective seller. "Contract interpretation is a question of law." <u>Redrock Valley Ranch, LLC v. Washoe Cnty.</u>, 254 P.3d 641, 647 (Nev. 2011). If the terms of a contract are clear and unambiguous, then it must be enforced as written. <u>See</u> <u>Am. First Fed. Credit Union v. Soro</u>, 359 P.3d 105, 106 (Nev. 2015). On the other hand, if a contract is "reasonably susceptible to more than one interpretation," then it is ambiguous, and the Court may "resort to extrinsic evidence" to determine its meaning. <u>See</u> <u>Margrave v. Dermody Props., Inc.</u>, 878 P.2d 291, 293 (Nev. 1994) (citations omitted). Finally, any "ambiguity . . . should be construed against the drafter." <u>Soro</u>, 359 P.3d at 106 (citation omitted).

The Brokerage Agreement is not a model of clarity, and the Court finds that its provisions do not clearly explain when Plaintiffs are entitled to a commission. One provision of the agreement proclaims that Plaintiffs are to be paid "after the listed IP numbers [are] sold." ECF No. 121-3 at ¶ 4. A few lines later, the agreement states that Plaintiffs should be paid "once the identity of the purchaser is revealed." <u>Id.</u> ¶ 7. Thus, the Brokerage Agreement is ambiguous as it is reasonably susceptible to more than one interpretation. Under Plaintiffs' view, they earned their commission as soon as they revealed Hazan as a prospective buyer. Under Defendants' view, Plaintiffs never earned their commission because the IP Assets have not been sold.

1    Since Plaintiffs drafted the Brokerage Agreement, the Court adopts the latter interpretation.

2    In Nevada, any ambiguities in a contract "should be construed against the drafter." Soro, 359 P.3d

3    at 106 (citation omitted). Plaintiffs urge the Court to adopt their interpretation of the Brokerage

4    Agreement based on extrinsic evidence. But they fail to identify any evidence that demonstrates

5    that the Parties intended to award Plaintiffs a commission for merely revealing the identity of a

6    prospective buyer. In the absence of this evidence, the Court declines to depart from Nevada's

7    basic principles of contract interpretation. Thus, the Court finds that the contract does not require

8    Plaintiffs to be paid until the IP Assets are sold.

9    The Court finds that there is a genuine dispute of material fact regarding the extension of

10   the Brokerage Agreement's terms. In Nevada, "the question of whether a contract exists is one of

11   fact." May v. Anderson, 119 P.3d 1254, 1257 (Nev. 2005). An enforceable contract requires "an

12   offer and acceptance, meeting of the minds, and consideration." Id. Here, Plaintiffs have presented

13   evidence of an enforceable contract to extend the Parties' rights and obligations under the

14   Brokerage Agreement. Specifically, they point to a February 2022 email in which Ingram

15   proposed: (i.) extension of the Parties' existing arrangement and (ii.) the extension of the loan-

16   repayment period. See ECF No. 121-12. Plaintiffs also cite a March 5, 2022, email in which

17   Plaintiff Ted Leach expressed his satisfaction with Ingram's proposal. See ECF No. 121-17.

18   Finally, Defendants themselves cite to deposition testimony in which Ingram acknowledges that

19   the Brokerage Agreement was extended through the end of the Oculus Lease. See ECF No. 110.

20   Based on this evidence, and all reasonable inferences drawn in Plaintiffs' favor, a reasonable jury

21   could conclude that the Parties agreed to extend their rights and obligations under the Brokerage

22   Agreement, and that the extension of the loan-repayment period served as Plaintiffs' consideration.

23   Finally, the Court is unpersuaded by Defendants' brief allusions to various defenses that

24   could theoretically discharge their obligation to pay Plaintiffs a commission pursuant to an

25   enforceable contract. First, Defendants invoke the doctrine of impossibility. See Nebaco, Inc. v.

26   Riverview Realty Co., 482 P.2d 305, 307 (Nev. 1971) ("[T]he defense of impossibility is available

27   to a promisor where his performance is made impossible."). Specifically, Defendants claim that

28   ARIN's 1-year restriction on the sale of the IP Assets made it impossible for them to close a sale

with Hazan. In response, Plaintiffs cite to Hazan's deposition testimony, in which he testifies that he was "ready, willing, and able" to finalize the sale of the IP Assets after ARIN's restriction came to light. See ECF No. 121-31. It is also not clear from the record whether there were exceptions or conditions related to the 1-year restriction or if some other type of transfer arrangement was possible. Based on this evidence, a reasonable jury could conclude that it was not impossible for Defendants to complete the sale. Accordingly, the Court declines to excuse Defendants' nonperformance as a matter of law based on the doctrine of impossibility. Second, Defendants claim that Plaintiffs' right to a commission was illusory. Defendants offer no legal analysis or authorities on this point. Thus, the Court declines to entertain this argument.

### 2. Formation of a Broader Lease-Revenue-Sharing Agreement.

The Court finds that there is a genuine dispute of material fact regarding the formation of a broader lease-revenue-sharing agreement. As a reminder, "the question of whether a contract exists is one of fact." Anderson, 119 P.3d at 1257. An enforceable contract requires "an offer and acceptance, meeting of the minds, and consideration." Id. Plaintiffs have presented evidence of an enforceable contract, whereby the Parties agreed to split revenue generated by leases of the IP Assets until the assets are sold. Specifically, Plaintiffs cite a February 21, 2022, email in which Ingram proposes: (i.) extending the Parties' agreement to include leasing and (ii.) extending the loan-repayment period. See ECF No. 121-12. Additionally, they point to a February 24, 2022, text message from Ingram, in which he states that he has already "given [Plaintiffs] 50% of leasing revenue for perpetuity / until [the IP Assets are sold], whenever that is." ECF No. 121-14. Plaintiffs also cite an email by Ted Leach, in which he expresses his satisfaction with the "50/50 split on the lease." ECF No. 121-17. Based on this evidence, and all reasonable inferences drawn in Plaintiffs' favor, a reasonable jury could conclude that the Parties agreed to split leasing revenue until the IP Assets are sold, and that the extension of the loan-repayment period served as Plaintiffs' consideration.

Finally, the Court finds that Nevada's Statute of Frauds does not bar this potential agreement. Under this statute, any agreement that cannot be performed within 1 year by its own terms must be in a signed writing. See NEV. REV. STAT. ANN. § 111.220(1) (West 2025).

1    Otherwise, the contract is void as a matter of law. See Stanley v. A. Levy & J. Zentner Co., 112

2    P.2d 1047, 1052 (Nev. 1941). Here, Plaintiffs have presented evidence of an agreement to split

3    revenue generated by leases of the IP Assets *until* they are sold. By its own terms, this potential

4    agreement could have been performed within a year, as the IP Assets could have theoretically been

5    sold well before 2023. Finally, the Court notes that Plaintiffs have presented evidence of signed

6    emails memorializing these terms. See ECF No. 121-17.

7         In sum, Plaintiffs' breach of contract claim relies on the existence of enforceable contracts,

8    which may or may not exist. Nevertheless, based on Plaintiffs' evidence, a reasonable jury could

9    conclude that they do. Finally, the Court is not persuaded by any of Defendants' contract defenses.

10   Therefore, it declines to grant summary judgment on this claim.

11             **ii.  *Plaintiffs' Good Faith and Fair Dealing Claim (Count 2).***

12        The Court denies summary judgment on Plaintiffs' claim for breach of the covenant of

13   good faith and fair dealing. "To establish a claim for breach of the implied covenant of good faith

14   and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that

15   the defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to

16   the purpose of the contract; and (3) [that] the plaintiff's justified expectations under the contract

17   were denied." Dinkins v. Schinzel, 362 F.Supp.3d 916, 927–28 (D. Nev. 2019) (citing Perry v.

18   Jordan, 900 P.2d 335, 338 (Nev. 1995)). Defendants focus on the second element, arguing that

19   they "did nothing to impair or impede any contractual rights Plaintiffs enjoyed." ECF No. 110.

20        Plaintiffs have presented sufficient evidence to create a genuine issue of disputed fact as

21   to this claim. As discussed above, the Parties dispute whether they entered an enforceable

22   contract to extend their rights and obligations as outlined in the Brokerage Agreement. It is

23   undisputed that the purpose of the agreement is to enable Plaintiffs to "seek a return on their

24   collective $200,000." ECF No. 110 at ¶ 7. In their response, Plaintiffs cite to various pieces of

25   evidence that suggest that Ingram was unfaithful to this purpose, namely: (i.) emails in which

26   Ingram asks Hazan to exclude Plaintiffs from a new purchase agreement, see ECF Nos. 121-21

27   & 121-28, and (ii.) deposition testimony in which Hazan clarifies that he was willing to close the

28   transaction in spite of the ARIN restriction. See ECF No. 121-31. Based on this evidence, and all

1    reasonable inferences drawn in Plaintiffs' favor, a reasonable jury could find that Ingram was

2    unfaithful to the purpose of the Parties' agreement by: a.) attempting to cut Plaintiffs out of a sale

3    they initially arranged and b.) refusing to finalize a transaction that would have entitled Plaintiffs

4    to a commission.

5         Accordingly, the Court denies grant summary judgment on Plaintiffs' claim for breach of

6    the implied covenant of good faith and fair dealing.

7             **iii.    *Plaintiffs' Unjust Enrichment Claim (Count 9).***

8         The Court denies summary judgment on Plaintiffs' unjust enrichment claim. In the

9    absence of an enforceable contract, a plaintiff can seek to recover "nonreturnable benefits [that]

10   have been furnished at the defendant's request" through an unjust enrichment claim. See

11   Certified Fire Prot. Inc. v. Precision Constr., 283 P.3d 250, 256–57 (Nev. 2012) (describing the

12   quasi-contract action for unjust enrichment). "Unjust enrichment exists when the plaintiff confers

13   a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and

14   retention by the defendant under circumstances such that it would be inequitable for [them] to

15   retain the benefit without payment of the value thereof." Id. at 257 (citations and internal

16   quotation marks omitted). Defendants argue that Plaintiffs' unjust enrichment claim fails as a

17   matter of law because: a.) it was not plead in the alternative to Plaintiffs' contract claims; b.)

18   Defendants did not retain any benefit conferred on them; and c.) Plaintiffs have unclean hands.

19   For the following reasons, the Court disagrees.

20        First, the Court declines to dismiss Plaintiffs' unjust enrichment claim merely because it

21   was framed as an alternative cause of action. As a preliminary matter, the authorities that

22   Defendants cite on this point do not stand for the proposition that an unjust enrichment claim

23   cannot be plead as a separate cause of action. Instead, they simply clarify that unjust enrichment

24   is not available "where there is an express written agreement." WMCV Phase 3, LLC v. Shushok

25   & McCoy, Inc., 750 F.Supp.2d 1180, 1196–97 (D. Nev. 2010) (citing Leasepartners Corp. v.

26   Robert L. Brooks Tr. Dated November 12, 1975, 942 P.2d 182, 187 (Nev. 1997)). In any case,

27   Federal Rule of Civil Procedure 8 requires this Court to construe pleadings "so as to do justice."

28   FED. R. CIV. P. 8(e). In their response, Plaintiffs ask this Court to construe their unjust

1    enrichment claim as an alternative cause of action. To avoid dismissing their claim based on a

2    seemingly non-existent procedural bar, this Court construes it as such.

3           Second, Plaintiffs' unjust enrichment claim does not fail as a matter of law merely

4    because Defendants returned their $200,000 loan. In the context of unjust enrichment, a benefit

5    can include "services beneficial to or at the request of the other" and "denotes any form of

6    advantage." Certified Fire Prot. Inc., 283 P.3d at 257 (citations omitted). In short, it "is not

7    confined to retention of money or property." Id. (citations omitted). Here, Plaintiffs claim that

8    Defendants have retained significant benefits from "Plaintiffs' financial contributions and

9    strategic efforts," namely the "acquisition of an IP asset worth about 3 million dollars." ECF No.

10   22. It is undisputed that Defendants currently retain title to the IP Assets. Thus, this Court cannot

11   conclude that they have not retained a benefit conferred onto them by Plaintiffs as a matter of

12   law.

13          Third, the Court will not bar Plaintiffs from pursuing equitable relief at this juncture. This

14   Court has "broad discretion" in applying the doctrine of unclean hands. See Las Vegas Fetish &

15   Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc., 182 P.3d 764, 767 (Nev. 2008) (citations

16   omitted). The Parties repeatedly accuse each other of misdeeds. On the current record, the Court

17   does not find that it can apply the doctrine of unclean hands to either party.

18          Moreover, the Court finds that Defendants' specific allegations of misconduct are not

19   enough to bar Plaintiffs from pursuing their unjust enrichment claim. In applying the doctrine of

20   unclean hands, this Court must consider "the egregiousness of the misconduct at issue" and "the

21   seriousness of the harm caused by the misconduct." Id. (citations omitted). "Only when these

22   factors weigh against granting the requested equitable relief will the unclean hands doctrine bar

23   that remedy." Id. (citations omitted). Defendants accuse Plaintiffs of having unclean hands

24   because they: (1) misrepresented their experience as brokers; (2) threatened Ingram; (3)

25   misrepresented their ability to act on James Kerrigan's behalf; and (4) invited Ingram to commit

26   fraud. Notably, Plaintiffs credibly rebut the first two accusations. See ECF No. 120 at 28–30.

27   While the Court does not discount the severity of any of these accusations, the Court declines to

28   make a finding on this disputed record. Accordingly, the Court declines to bar Plaintiffs from

1    pursuing equitable relief at this time.

2              **iv.  *Plaintiffs' Fraudulent Transfer Claims (Counts 13–15).***

3              Nevada has adopted the Uniform Fraudulent Transfer Act ("UFTA"), which allows three

4    types of transfers to be set aside: "(1) actual fraudulent transfers; (2) constructive fraudulent

5    transfers; and (3) certain transfers by insolvent debtors." Herup v. First Bos. Fin., LLC, 162 P.3d

6    870, 873 (Nev. 2007) (citing NEV. REV. STAT. ANN. §§ 112.180 & 112.190 (West 2025)).

7    Plaintiffs bring claims under all three provisions, alleging that Defendants made actual and

8    constructive fraudulent transfers while being insolvent. Defendants urge this Court to grant

9    summary judgment against these claims because there is no evidence of Defendants' intent "to

10   defraud, impair, impede, or hinder" Plaintiffs' contractual rights. For the following reasons, the

11   Court rejects Defendants' arguments.

12             As a preliminary matter, "intent to hinder, delay or defraud" is only an element of actual

13   fraudulent transfers. See NEV. REV. STAT. ANN. § 112.180(1)(a) (West 2025). Put simply, a

14   plaintiff must prove different elements to establish that a transfer was constructively fraudulent

15   or made by an insolvent debtor. See Herup, 162 P.3d at 873 n.12 & n.14 (describing these

16   elements). To that end, the Court declines to grant summary judgment on Plaintiffs' claims of

17   constructive fraudulent transfer or transfer by an insolvent debtor, as Defendants have not

18   substantively addressed them.

19             In any case, Plaintiffs have presented sufficient evidence to survive summary judgment

20   on the issue of actual intent. The UFTA provides a non-exclusive list of factors to determine

21   whether a debtor made a transfer with actual fraudulent intent. See generally NEV. REV. STAT.

22   ANN. § 112.180(2) (West 2025). Amongst other things, a fact finder may consider whether: "(a)

23   [t]he transfer . . . was to an insider; (b) [t]he debtor retained possession or control of the property

24   transferred . . . ; [and] (c) [t]he transfer . . . was . . . concealed." Id. Defendants maintain that

25   EpicUp Holdings, Inc. has always held title to the IP Assets. In response, Plaintiffs cite various

26   pieces of evidence that suggest that the IP Assets are actually owned by another corporate

27   Defendant, namely EpicUp PTE. See, e.g., ECF No. 121-8 (asserting EpicUp PTE's "right, title,

28   and interest" in the IP Assets). On this record, a reasonable jury could find that Defendants have

1   discreetly transferred ownership of the IP Assets between themselves, and that their actions

2   reflect actual fraudulent intent based on the UFTA's factors. It is undisputed that Ingram

3   exercises control over all corporate Defendants, and a jury could reasonably infer that they are

4   insiders relative to each other. In short, there is a genuine dispute of material fact regarding

5   Defendants' intent, and therefore summary judgment is inappropriate on these claims.

6             **v.  *Plaintiffs' Intentional Misrepresentation Claims (Counts 3 and 4).***

7           In Nevada, "[i]ntentional misrepresentation is established by three factors: (1) a false

8   representation that is made with either knowledge or belief that it is false or without a sufficient

9   foundation, (2) an intent to induce another's reliance, and (3) damages that result from this

10  reliance." Nelson v. Heer, 163 P.3d 420, 426 (Nev. 2007) (citation omitted). Notably, "the

11  suppression or omission of a material fact which a party is bound in good faith to disclose is

12  equivalent to a false representation." Id. (citations and internal quotation marks omitted).

13  Defendants take issue with the first and third elements of Plaintiffs' claims, arguing that

14  Plaintiffs have failed to concretely identify any fraudulent representations or resulting damages.

15  The Court disagrees.

16          The Court finds that there is a genuine dispute of material fact as to the first element. To

17  show that Defendants made false representations, Plaintiffs point to a declaration[2] in which Jason

18  Kerrigan states that "Defendant INGRAM represented to Plaintiffs . . . that there would be no

19  title issues and that the IPs could be sold immediately." ECF No. 121-29 at ¶ 17. It is undisputed

20  that Defendant Ingram was aware of the title issues associated with the IP Assets. Based on this

21  record, a reasonable jury could conclude that Ingram misrepresented the true extent of the IP

22  Assets' title issues, either by mischaracterizing or concealing them.

23          Additionally, Plaintiffs have presented sufficient evidence to survive summary judgment

24

---

25      [2] In their reply, Defendants urge the Court to disregard this declaration because it is self-serving and it
    contradicts Jason Kerrigan's prior deposition testimony. In the Ninth Circuit, a "district court can disregard a self-

26  serving declaration that states only conclusions and not facts that would be admissible evidence." Nigro v. Sears,
    Roebuck and Co., 784 F.3d 495, 497 (9th Cir. 2015) (citations omitted). For the purposes of this Order, Kerrigan's

27  declaration details specific facts about Plaintiffs' interactions with Ingram, as well as Plaintiffs' state of mind. In other
    words, the declaration is not "lacking detailed facts and any supporting evidence" such that it would be appropriate to
    disregard it. See F.T.C. v. Publishers Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997). Accordingly, the

28  Court declines to do so. To the extent that the declaration is contradictory, Defendants are free to challenge its weight
    before a jury.

based on the issue of damages. In Nevada, one measure of damages for fraudulent misrepresentation "allows the defrauded party to recover the benefit-of-his-bargain, that is, the value of what he would have if the representations were true, less what he [ ] received." Randono v. Turk, 466 P.2d 218, 222–23 (Nev. 1970) (citations omitted). The defrauded party must establish that their losses were proximately caused by their reliance on "the original misrepresentation or omission." Nelson, 163 P.3d at 426 (citation omitted). Here, Plaintiffs have presented evidence of their losses and of causation. To establish their losses, Plaintiffs cite the Brokerage Agreement, the Purchase Agreement, and various declarations to show that they were poised to earn $725,000 through the sale of the IP Assets to Hazan. To show causation, Plaintiffs point to a declaration which clarifies that they decided to contract with Ingram based on his "representations regarding the vendibility of title." ECF No. 121-29 at ¶ 18. Finally, it is undisputed that the Purchase Agreement did not close due to the IP Assets' title issues. On this record, the Court finds that there is a genuine dispute of material fact as to whether Plaintiffs suffered damages because of Ingram's allegedly fraudulent representations.

### vi. *Plaintiffs' Negligent Misrepresentation Claim (Count 6).*

The Court grants summary judgment on this claim. To prevail on a claim for negligent misrepresentation, a plaintiff must show that defendant(s) "fail[ed] to exercise reasonable care or competence in obtaining or communicating [false] information." Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1387 (Nev. 1998); Reynolds v. Tufenkjian, 461 P.3d 147, 153 (Nev. 2020) (reaffirming). In other words, a plaintiff must establish that the defendant was somehow negligent. According to Defendants, Plaintiffs have not identified any negligent conduct that could support their negligent misrepresentation claim. The Court agrees.

Throughout their response, Plaintiffs do not even discuss this claim, and they certainly do not cite any evidence that could establish Defendants' negligence. At this procedural posture, it was incumbent on Plaintiffs to establish a genuine dispute of material fact on this issue to preserve their claim for negligent misrepresentation. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986). Since they do not, the Court finds that a reasonable jury cannot rule in their favor, and it grants summary judgment against this claim.

1       **vii.  *Plaintiffs' False Promise Claim (Count 5).***

2           The Court grants summary judgment on Plaintiffs' False Promise Claim. "For a

3   promissory fraud claim, the plaintiff must prove five elements . . . : (1) the defendant made a

4   false representation, (2) the defendant knew or believed that the representation was false, (3) the

5   defendant intended to induce the plaintiff [to rely] on the misrepresentation, (4) the plaintiff

6   justifiably relied on the misrepresentation, and (5) the plaintiff suffered damages from the

7   reliance." Las Vegas Sands, Inc. v. Suen, 367 P.3d 792, at 8 (Nev. 2010) (unpublished table

8   decision) (citing Bulbman, Inc. v. Nev. Bell, 825 P.2d 588, 592 (Nev. 1992)). "Due to these

9   elements, a plaintiff can survive a motion for summary judgment . . . if there is evidence showing

10  that the defendant had no intention of performing the promise at the time when he or she made

11  the promise." Id. (citing Bulbman, Inc., 825 P.2d at 592). The Court finds that Plaintiffs have

12  failed to meet their burden of production on this specific issue.

13          Plaintiffs claim that Defendant Ingram never intended to perform two promises: (a.) his

14  promise to pay them a commission and (b.) his promise to pay them a share of the IP Assets'

15  leasing revenue. Nevertheless, Plaintiffs fail to cite any evidence that reveals Ingram's intent at

16  the time he made these promises—i.e., March of 2022 at the latest. Instead, they rely on federal

17  case law to argue that his fraudulent intent can be inferred from his failure to perform these

18  promises several months later. But the Nevada Supreme Court has clarified that "[t]he mere

19  failure to fulfill a promise . . . in the future . . . [does] not give rise to a fraud claim absent

20  evidence that the promisor had no intention to perform at the time the promise was made."

21  Bulbman, Inc., 825 P.2d at 592 (citation omitted).  In other words, Plaintiffs cannot establish that

22  Ingram made fraudulent promises by merely asserting that he failed to perform them several

23  months down the line.

24          Since Plaintiffs have not presented evidence that would allow a reasonable jury to rule in

25  their favor on an essential element of their promissory fraud claim, the Court grants summary

26  judgment on this claim.

27      **viii.  *Plaintiffs' Negligence Claim (Count 7).***

28          Defendants argue that Plaintiffs' negligence claim fails as a matter of law because it is

1    barred by the economic loss doctrine. The Court agrees.

2        Nevada's economic loss "doctrine bars unintentional tort actions when the plaintiff seeks

3    to recover purely economic losses." Terracon Consultants W., Inc. v. Mandalay Resort Grp., 206

4    P.3d 81, 86 (Nev. 2009). Through their negligence claim, Plaintiffs seek to do just that, as they

5    are asking for damages. See ECF No. 103 at ¶ 133. Granted, the Nevada Supreme Court has

6    carved out narrow exceptions to the economic loss doctrine. See, e.g., Halcrow, Inc. v. Eighth

7    Jud. Dist. Ct., 302 P.3d 1148, 1153 (Nev. 2013) (recognizing an exception for certain negligent

8    misrepresentation claims). Nevertheless, Plaintiffs do not even ask this Court to consider them.

9    This is unsurprising, as Plaintiffs' negligence claim is framed as a straightforward unintentional

10   tort action, and it falls squarely within the ambit of the economic loss doctrine. See Terracon

11   Consultants W., Inc., 206 P.3d at 87 ("[A] plaintiff may not recover in negligence for economic

12   losses.") (citation omitted).

13        Since Plaintiffs' negligence claim is barred by the economic loss doctrine, it fails as a

14   matter of law. Accordingly, the Court grants summary judgment on this claim.

15        **ix.  *Plaintiffs' Procuring Cause Claim (Count 11).***

16        Nevada's "doctrine of 'procuring cause' developed primarily to protect [a] broker where

17   he or she arranges a sale but nonetheless, according to the strict terms of the broker's contract,

18   the broker is not otherwise entitled to a commission." Carrigan v. Ryan, 858 P.2d 29, 30 (Nev.

19   1993) (citation omitted). It has generally been applied in the context real estate transactions,

20   where it has enabled brokers to recover in *quantum meruit* insofar as "an employment contract"

21   exists and the broker was "the 'procuring cause' of [a] sale." Id. (citations omitted). Defendants

22   argue that Plaintiffs cannot recover under this equitable doctrine because a sale has not occurred.

23        The Court agrees.  It is undisputed that the IP Assets have not been sold. Plaintiffs cannot

24   show that they were the "procuring cause" of a sale that never occurred. And, this Court has not

25   been presented with any authority that suggests that a broker can invoke the doctrine of

26   procuring cause in the absence of a sale. In fact, the Court's review of the relevant case law

27   demonstrates that Nevada courts apply this doctrine only after a sale has occurred. See, e.g.,

28   Atwell v. Sw. Sec., 820 P.2d 766, 768 (Nev. 1991) ("The Marina and Tropicana Golf Course

1   were eventually sold. . . ."); Carrigan, 858 P.2d at 30 ("After the closing, Ryan refused to pay

2   Brown his commission."); Shell Oil Co. v. Ed. Hoppe Realty Inc., 540 P.2d 107, 108 (Nev.

3   1975) ("Prior to the sale in question . . . ."). Finally, the Court notes that Plaintiffs have presented

4   no evidence of an "employment contract"—the other element of an unjust enrichment claim

5   premised on the doctrine of procuring cause.

6          In sum, Plaintiffs have not, and cannot, present evidence that enables them to invoke the

7   doctrine of procuring cause. Accordingly, their procuring cause claim fails as a matter of law,

8   and this Court grants summary judgment on this claim.

9                    **x.   *Plaintiffs' Conversion Claim (Count 10).***

10         The Court grants summary judgment on Plaintiffs' conversion claim. In Nevada,

11  "[c]onversion is a distinct act of dominion wrongfully exerted over another's *personal property*

12  in denial of, or inconsistent with [their] title or rights therein or in derogation, exclusion, or

13  defiance of such title or rights." Evans v. Dean Witter Reynolds, Inc., 5 P.3d 1043, 1048 (Nev.

14  2000) (emphasis added) (citation and internal quotation marks omitted). It follows that a plaintiff

15  must have a cognizable interest in the property that forms the basis of their claim(s) to succeed

16  on a theory of conversion. Based on the plain text of the Brokerage Agreement, the Court finds

17  that Plaintiffs do not have a property interest in the IP Assets.

18          It is undisputed that the Parties entered into the Brokerage Agreement to define their

19  rights and obligations relative to the purchase and sale of the IP Assets. As a reminder,

20  "[c]ontract interpretation is a question of law," Redrock Valley Ranch, LLC, 254 P.3d at 647,

21  and this Court must enforce the clear and unambiguous terms of a contract. See Am. First Fed.

22  Credit Union, 359 P.3d at 106. The Brokerage Agreement clearly states that "[t]he general intent

23  of the parties is to ensure that [Defendant EpicUp Holdings, Inc. (Arizona)] takes ownership and

24  complete interest in the [IP Assets]." ECF No. 121-3 at ¶ 3.

25         Plaintiffs cannot overcome the plain text of this provision by relying on a handful

26  statements which suggest that they have a stronger interest in the IP Assets. As a preliminary

27  matter, the Court cannot vary or contradict the clear, definite terms of the Brokerage Agreement

28  based on statements, negotiations, or agreements that were made before it was drafted. See Ringle

1    v. Bruton, 86 P.3d 1032, 1037–38 (Nev. 2004) (describing the parole evidence rule). So, the Court

2    disregards any evidence of the Parties' original oral agreement, as this agreement and its

3    underlying negotiations merged into the Brokerage Agreement. See Tallman v. First Nat'l Bank

4    of Nev., 208 P.2d 302, 306 (Nev. 1949); see also ECF No. 121-3 at ¶ 15 (provision of the

5    Brokerage Agreement that clarifies that it is the Parties' "entire agreement"). Finally, Plaintiffs

6    have not presented evidence of a subsequent agreement to modify this provision. At most, they

7    have created a genuine dispute of material fact as to whether the original terms of the Brokerage

8    Agreement were extended beyond March 1, 2022. See supra Part IV.A.i.1.

9         The Court grants summary judgment on this claim.

10        **xi.  *Plaintiffs' Alter Ego Claim (Count 12).***

11        According to Defendants, Plaintiffs' alter ego claim fails as a matter of law because only

12   judgment creditors can bring this type of claim as an independent cause of action. Based on

13   Nevada's limited case law on this specific issue, the Court agrees.

14        Generally, the alter ego doctrine is a theory of liability that empowers courts to "pierc[e]

15   the corporate veil" when a defendant abuses its formalities. See LFC Mktg. Grp. Inc. v. Loomis,

16   8 P.3d 841, 845–46 (Nev. 2000) (citations omitted). In doing so, a court casts aside the

17   "corporate cloak" and allows a plaintiff to proceed against a business organization's individual

18   owner(s). See Ene v. Graham, 546 P.3d 1232, 1235–36 (Nev. 2024). To avoid due process

19   concerns, the Nevada Supreme Court has interpreted this doctrine to supply a separate cause of

20   action to creditors who seek to make a third party liable on an existing judgment. See Magliarditi

21   v. TransFirst Grp., Inc., 450 P.3d 911, at 2 (Nev. 2019) (unpublished table decision) ("[T]he alter

22   ego doctrine can be a separate cause of action when the claim is filed as a means for a judgment

23   creditor to pursue the execution of a prior judgment."); see also Callie v. Bowling, 160 P.3d 878,

24   881 (Nev. 2007) ("A [judgment creditor] who wishes to assert an alter ego claim must do so in

25   an independent action against the alleged alter ego with the requisite notice, service of process,

26   and other attributes of due process.").

27        It is undisputed that Plaintiffs are not judgment creditors. Furthermore, they do not ask

28   the Court to expand this cause of action to other types of claimants. In fact, Plaintiffs do not even

1    discuss this claim in their response. Accordingly, Plaintiffs' alter ego claim fails as a matter of

2    law, and the Court grants summary judgment on this claim.

3        To be clear, the Court expresses no opinion on whether Plaintiffs can rely on the alter ego

4    doctrine as a theory of liability, as opposed to an independent cause of action. Plaintiffs are

5    welcome to invoke this doctrine to argue that Defendant Ingram is "personally liable for all of

6    the debts and obligations" of his co-defendants. See ECF No. 103 at ¶ 164.

7        **xii.  *Plaintiffs' Claims for Declaratory and Injunctive Relief (Counts 8 and 16).***

8        In their complaint, Plaintiffs assert independent claims for "Declaratory Relief" and

9    "Injunctive Relief." See ECF No. 103 at 15 & 22. For the following reasons, the Court grants

10   summary judgment on both of these claims.

11              1.   Plaintiffs' Requests for Declaratory Relief Are Irrelevant or Duplicative.

12       Plaintiffs seek a declaratory judgment that would determine: (a.) the Parties' rights and

13   obligations under a property insurance policy; (b.) the Parties' rights and obligations under "the

14   agreements;" and (c.) the Parties' rights and obligations with respect to Plaintiffs' claims. See ECF

15   No. 103 ¶¶ 138–39. The Court will not consider these requests through an independent cause of

16   action because they are irrelevant to this case or duplicative of Plaintiffs' other claims.

17       As a preliminary matter, this case is not an insurance dispute, and the Parties have not

18   brought an insurance policy to this Court's attention. Therefore, the Court disregards Plaintiffs'

19   requests for declaratory relief regarding irrelevant insurance policies.

20       Plaintiffs' remaining requests are duplicative of their other claims. First, a declaratory

21   judgment on the Parties' actual or alleged agreements would be duplicative of Plaintiffs' breach

22   of contract claim. Second, a declaratory judgment on Plaintiffs' claims is necessarily duplicative

23   of the claims themselves. "Where a claim for declaratory relief is merely duplicative of other

24   causes of action asserted by a plaintiff, dismissal is proper." Tyler v. Travelers Com. Ins. Co., 499

25   F.Supp.3d 693, 702 (N.D. Cal. 2020) (citing Swartz v. KPMG LLP, 476 F.3d 756, 765–66 (9th

26   Cir. 2007)).

27       Accordingly, the Court grants summary judgement on Plaintiffs' independent claim for

28   declaratory relief.

1

2.  <u>Injunctive Relief Is Not A Separate Cause of Action.</u>

2

Plaintiffs are also pursuing injunctive relief as a separate cause of action. It is well-settled

3

that injunctive relief is a remedy, not an independent cause of action. <u>See, e.g.,</u> Carrington

4

<u>Mortg. Servs., LLC v. SFR Inv. Pool 1, LLC</u>, 377 F.Supp.3d 1187, 1193 (D. Nev. 2019); <u>In re</u>

5

<u>Wal-Mart Wage & Hour Emp. Pracs. Litig.</u>, 490 F.Supp.2d 1091, 1130 (D. Nev. 2007).

6

Accordingly, the Court grants summary judgment against this claim

7

To the extent that Plaintiffs seek a preliminary injunction, they must file a separate

8

motion with updated arguments. The Court declines to grant an "extraordinary remedy" based on

9

stale arguments embedded in an off-topic brief that is now several months old. <u>Cf.</u> <u>Winter v.</u>

10

<u>Nat'l Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (characterizing a preliminary injunction as an

11

"extraordinary remedy" that requires clear showings).

12

3.  <u>Declaratory and Injunctive Relief for Plaintiffs' Other Claims</u>

13

To be clear, the Court is only granting summary judgment on Plaintiffs' *independent claims*

14

for declaratory and injunctive relief. Plaintiffs can still pursue these remedies based on their other

15

claims.

16

**xiii.  *The Court Declines to Limit Plaintiffs' Damages at this Time.***

17

Finally, the Court declines to limit Plaintiffs' damages at this time. Defendants ask the

18

Court to limit Plaintiffs' damages because they have not provided adequate computations, as

19

required by Federal Rule of Civil Procedure 26. <u>See</u> FED. R. CIV. P. 26(a)(1)(A)(iii). This Court

20

has broad discretion over discovery sanctions, <u>see</u> <u>Payne v. Exxon Corp.</u>, 121 F.3d 503, 507 (9th

21

Cir. 1997), and it may impose "a wide range of sanctions" on a party when it fails to comply with

22

discovery rules. <u>See</u> <u>Wyle v. R.J. Reynolds Indus., Inc.</u>, 709 F.2d 585, 589 (9th Cir. 1983); <u>see</u>

23

<u>also</u> FED. R. CIV. P. 37(b)(2).

24

At this point, the Court will not limit Plaintiffs' damages. Defendants have not established

25

any harm resulting from Plaintiffs' allegedly deficient computations. Defendants did not bring this

26

deficiency to the Court's attention before the close of discovery. And Plaintiffs can still provide

27

complete calculations of their damages and fees based on their remaining claims.

28

1

2        **B. Motion to Appoint Receiver**

3        The Court now turns to Plaintiffs' Motion to Appoint Receiver. The Court denies their motion.

4                **i. *Defendants' Motion to Strike.***

5        Before ruling on Plaintiffs' motion to appoint a receiver, the Court must decide whether it

6        should strike certain elements of Plaintiffs' reply in support of this motion. Specifically,

7        Defendants urge the Court to strike: a.) new authorities; b.) new evidence; and c.) new arguments

8        supported by either of them.

9        A district court should not consider new arguments or evidence in a reply brief unless the

10        opposing party has had an opportunity to respond to them. See Flathead-Lolo-Bitterroot Citizen

11        Task Force v. Mont., 98 F.4th 1180, 1189–90 (9th Cir. 2024).

12        Initially, the Court declines to strike the new authorities cited in Plaintiffs' reply.

13        Defendants offer no support for their argument that a reply brief cannot contain new authorities.

14        The Court will not adopt the odd proposition that a party cannot provide new authorities in a reply

15        brief, which very well could support existing arguments.

16        Nevertheless, the Court will strike new evidence submitted in Plaintiffs' reply, namely: a.)

17        the Affidavit of Theodore Leach and b.) the Supplemental Information Provide by Thomas

18        Fantacone. See ECF Nos. 129-2 & 129-3. It is undisputed that these exhibits were presented for

19        the first time in Plaintiffs' reply. Therefore, this Court cannot consider them unless it offers

20        Defendants an opportunity to respond to them, and this Court declines to delay a ruling on

21        Plaintiffs' motion to appoint a receiver. Accordingly, this Court disregards these exhibits, and any

22        associated footnotes, for the purposes of this Order.

23        Finally, the Court declines to strike the so-called new arguments in Plaintiffs' reply. In

24        their motion to strike, Defendants urge the Court to disregard all arguments supported by the "new

25        Exhibits [ ] and . . . authorities" in Plaintiffs' reply. See ECF No. 130 at ¶ 3. In other words,

26        Defendants identify no specific arguments that are purportedly new. Based on its review of

27        Plaintiffs' reply, the Court finds that it revolves around arguments that Plaintiffs already presented

28        in their original motion.

1

ii. *Appointment of a Receiver.*

2      Pursuant to its equitable powers, this Court has broad discretion to appoint a receiver. See

3  Can. Life Assurance Co. v. LaPeter, 563 F.3d 837, 845 (9th Cir. 2009); see also FED. R. CIV. P.

4  66. Nevertheless, the Ninth Circuit has cautioned that a receiver "is an extraordinary equitable

5  remedy, which should be applied with caution." Id. at 844 (citations and internal quotation marks

6  omitted). To that end, the Ninth Circuit has approved of seven non-exclusive factors to guide

7  district courts' discretion in this context, namely: "(1) whether [the party] seeking the appointment

8  has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct[ ]

9  by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured,

10  diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the

11  harm to plaintiff by denial of the appointment would outweigh injury to the party opposing

12  appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable

13  injury to plaintiff's interest in the property; and, (7) whether [the] plaintiff's interests sought to be

14  protected will in fact be well-served by receivership." Id. (citations and internal quotation marks

15  omitted).

16      Based on these factors, the Court declines to appoint a receiver over the corporate

17  Defendants. The Court finds that only two of these factors weighs firmly in favor of appointment.

18  Specifically, Plaintiffs have presented valid claims. See supra Part IV.A. Furthermore, a receiver

19  would serve Plaintiffs' interests in preserving the IP Assets, as a receiver would exercise direct

20  control over the assets and any revenue generated by them. On the other side of the equitable

21  ledger, the Court finds that the remaining factors do not support the appointment of a receiver.

22      First, Plaintiffs have not established a probability of success on their remaining claims, as

23  they are all based on fiercely disputed facts. See id. Second, Plaintiffs have not established that

24  there is a probability of fraudulent conduct, as their claims of fraud are also factually disputed. See

25  id. At best, they have established a *possibility* of success and fraudulent conduct.

26      Third, Plaintiffs have not shown that their alleged interest in the IP Assets is in imminent

27  danger of being lost, diminished, concealed, or squandered.[3] Defendants currently hold the IP

28

[3] In reaching this conclusion, the Court is mindful of the fact that Plaintiffs waited over two years to seek the

1    Assets, and they cannot sell them pursuant to this Court's prior Order. <u>See</u> ECF No. 33. It is

2    undisputed that these assets are worth more than the approximately $1,000,000 Plaintiffs were

3    seeking before this Court dismissed many of their claims. <u>See</u> ECF No. 120 at 22. If, and when,

4    Plaintiffs succeed on any of their claims, the IP Assets can be liquidated to satisfy their judgment

5    against Defendants.

6        Fourth, Plaintiffs have not shown that legal remedies are inadequate here. At the end of the

7    day, Plaintiffs are seeking monetary damages through this lawsuit. An award of damages is the

8    poster child of legal remedies. <u>See</u> <u>Ariz. Dream Act Coal. v. Brewer</u>, 855 F.3d 957, 978 (9th Cir.

9    2017). As discussed above, the IP Assets can be liquidated to provide full recovery to Plaintiffs in

10   the event that they succeed on any of their remaining claims.

11       Fifth, Plaintiffs have not established that the balance of hardships weighs in their favor.

12   Plaintiffs argue that they are facing irreparable harm because Defendants are spending the IP

13   Assets' leasing revenue. Plaintiffs' argument presupposes that they are contractually entitled to

14   this revenue. But the Parties fiercely dispute the existence of a lease-revenue sharing agreement.

15   <u>See</u> <u>supra</u> Part IV.A.ii. Accordingly, the Court cannot conclude that Plaintiffs are being harmed at

16   this time, as Plaintiffs' right to any leasing revenue remains unsettled. In any case, "economic

17   injury alone does not support a finding of irreparable harm[ ] because such an injury can be

18   remedied by a damage award." <u>Rent-A-Center, Inc. v. Canyon Television and Appliance Rental,</u>

19   <u>Inc.</u>, 944 F.2d 597, 603 (9th Cir. 1991) (citation omitted).

20       Based on the foregoing analysis, the Court concludes that the appointment of a receiver is

21   not warranted at this time. Accordingly, the Court denies Plaintiffs' motion for the appointment of

22   a receiver.

23

24

25

26

27

28   appointment of a receiver. Presumably, they would have sought this extraordinary remedy at an earlier time if they
     were at risk of imminent danger.

1

### V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 110) is **GRANTED IN PART** and **DENIED IN PART**. The Court grants summary judgment on the following claims: negligent misrepresentation (Count 6); false promise (Count 5); negligence (Count 7); procuring cause (Count 11); conversion (Count 10); alter ego (Count 12); declaratory relief (Count 8); and injunctive relief (Count 16). Summary judgment is denied as to the remaining claims. Plaintiffs may still pursue declaratory relief and injunctive relief for their remaining claims. Plaintiffs may also rely on the alter ego doctrine as a theory of liability.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (ECF No. 130) is **GRANTED IN PART** and **DENIED IN PART**. The Court disregards Plaintiffs' new exhibits in evaluating their motion to appoint a receiver.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Appoint Receiver (ECF No. 123) is **DENIED** without prejudice.

**IT IS FURTHER ORDERED** that the Parties shall file a Joint Pretrial Order by **November 7, 2025**.

**DATED:** September 30, 2025.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**